Mr. Botkin May it please the Court, Ryan Botkin for Appellant Justice, Direct Biologics, LLC. Adam McQueen was Direct Biologics Executive Vice President for Marketing, Regulatory, Clinical, and Medical Education. Days after he left Direct Biologics, he became the Vice President of Product Strategy for a direct competitor, Vivex Biologics. His responsibilities there included, among other things, product strategy for a directly competing product. My client sought to enforce his agreements, including two distinct non-competes after an evidentiary hearing, the District Court found all of the contract predicates necessary to find breach of these two non-competes. And as Mr. McQueen admitted, that he still retains Direct Biologics confidential and trade secret information. The District Court denied injunctive relief because it found the element of reparable harm had not been satisfied. But in doing so, it made at least three independent reversible legal errors. First, the District Court misconstrued the contract, refusing to find breach despite the presence of all the necessary contractual predicates. Second, the Court refused to apply the legal presumption of irreparable harm, which courts recognize in this situation because of the inherently irreparable nature of the harm at issue. And third, the Court simply misapplied the statutory framework for trade secret injunctions, in part by requiring evidence that the information had already been disclosed. The factual record here overwhelmingly justified injunctive relief. As Executive VP for Marketing, Regulatory, Clinical, and Medical Education, Mr. McQueen led product strategy for the company's only revenue-generating product. He sat on its Intellectual Property Steering Committee and, importantly, participated as an executive in highly sensitive product strategy decisions surrounding all of the company's products, including the extracellular vesicle product. Both parties have agreed that we're looking at Texas law about preliminary injunctions in irreparable harm, correct? There is also a non-compete with respect to the equity piece governed by Wyoming law. We've minimized the discussion of that, but we've primarily focused on Texas law. So with the primary focus on Texas law, what is it that triggers, in your opinion, the presumption of irreparable injury? Well, the way the cases are phrased, Your Honor, it's triggered by breach. It's triggered by the breach. By breach. And so the way it's phrased is when a highly trained employee is breaching a non-compete, then the presumption... End of story, you get presumption. What's your best case for that? Because it is turgid. I would look at a case like the Ackruent case. The what? It's a P case. It's cited in our briefing. P case, okay, I'll find it. It's not PowerPoint, but it sounds a lot like it. Okay, those two cases stand for the proposition breach alone. What would you... Is that reconcilable with the decision, the panel I was on, Cardone, that I thought said there has to be some individualized assessment about the likelihood of disclosure? Yes or no? Well, with respect to disclosure, that shouldn't be relevant to the breach of a non-compete injunction. But that was a non-compete case, right? Wasn't Cardone... You're familiar with Cardone? Yes, sir. So, I guess, to me, at the nub of the dispute here is, can it be simply... Or is it, under Texas law, automatically triggered by breach? That's the way the case is represented. That's your position, but what if we find that there has to be some assessment of imminent disclosure likely? Not just that the person is in breach of his contractual agreement. Well, I want to be clear about the harm at issue. Yeah. Disclosure piece is not necessarily the only element, and here we're sort of borrowing from trade secret law. Right. It could be either use or disclosure. Use implies possession of the information in a position to use it. And that principle, I think, could be applicable. But if we agree there's a breach, this decision was decided on lack of irreparable harm. That's right. So that's what I'm sort of getting at, and you're saying Texas law presumes harm in this circumstance? Yes. Okay. It's a rebuttable presumption, but the law presumes harm. And instead, what happened here was the court said it's a permissive? It's not clear. The court seems to have said there was no breach, and our position is that she imported an additional proof requirement into the... She found there's a breach. He's working there, and it's within the year. Fairly. And I think in a similar situation, I know opposing counsel disagrees, but I really thought it was just that you hadn't shown evidence to trigger the presumption. That seems to be what she wrote in the order, Your Honor. I mean, she was saying there was no presumption because there was no breach. Okay. Keep going. Go ahead. Okay. Let me ask you one thing while you stop. Yes, Your Honor. So McQueen and the VIVAX representatives testified that they had about 200 different product lines, and that DB has two product lines, and they only competed with DB on only one of those products, an amnio wrap product. Is there contrary evidence in the record on those two points? Yes, Your Honor. The evidence is uncontroverted with respect to the one amnio wrap product that the parties do directly compete on, and in fact, that's the same product line that Mr. McQueen led at DirectBiologics and which he will lead at VIVAX. So that alone ought to establish the entitlement to irreparable harm. The other product line that DirectBiologics has, there's a contested issue about whether VIVAX is developing an extracellular vesicle product. That's the bit about the 361, and they're taking it off the market, and it has to go through the FDA regulatory process. There is evidence in the record, Your Honor, that VIVAX is developing that product. They've got a shareholder update, and there's testimony from one of their shareholders. A product that DB pulled off the market? Well, you have to know a little bit about this type of product. It's a biologic product that is derived from stem cells. Several years ago, the FDA had let them be unregulated, what's called 361 of the Food and Drug Act. They changed their mind and decided that all those products needed to be regulated as drugs under 351 of the FDA Act, and so all of the drugs were pulled off the market, and actually, it's a good question because I want to use it to help explain part of the irreparable harm that we feel that we're suffering. So once the product was pulled off the market and starts going through the 351 process, my client, DirectBiologics, was first in the race. We were able to position the product, develop it, and position it in the regulatory process that gave it a head start, and we are now the first product. You had human data for safety and effectiveness, presumably. I'm sorry? You would have had human data on safety and effectiveness. Correct, but everybody else would as well. If not, they didn't have the equivalent product. That's right. That's right. We're now in phase three, so we're first in the race, and one of the indications, one of the principal indications is a COVID inflammation treatment, and that's why it's so important that we run this through first. It's not the only product in that marketplace. Vivex is developing a similar product we now know, and the information that Mr. McQueen possesses from his time at DirectBiologics by virtue of his participation in these executive strategy meetings and his understanding of the regulatory strategies and the product development strategies and the technical strategies, the localization and encapsulization technologies, that would enable Vivex to develop their product in a similar way, and so the harm that we see Mr. McQueen porting over to Vivex is the possibility that they could jumpstart their own product development effort and catch up with DirectBiologics. At the moment, we enjoy a competitive advantage that would be diminished, we fear. Am I right or is it oversimplification that the magistrate judge here said, well, you're right, all you've shown is a possibility, and instead the record reflects they've walled them off completely. You wouldn't extend the non-compete to any other job, right? It's got to be a similar one, and the argument here, right, would your argument extend they've said we've walled them off completely from competing products? And it's a proof point. That's the case that we're trying to think of. Proof point. Okay. And the reason, there's a case called Accurant, where a party makes a similar type of, you know, claim that they're not competing with Vivex on any product, and the judge says, well, we're not competing with Vivex on any product, we're competing with DirectBiologics on any product. We won't compete in a certain area. And the court in that case, the Robert Pittman case from 2018, found that that sort of bare promise isn't enough. Between employer and employee. Right. Right. But there's . . . And it's . . . He had not been involved in any product that DB competed with Vivex on. Judge, I recognize the line of Texas cases that hold that an employee can't be prohibited from using, from taking any job in the industry. It's got to have some, bear some relationship between the prior job and the new job. With a company like this, the danger of Mr. McQueen bleeding out that information within a competitive company, without any verifiable way to ensure that that doesn't happen, that's the purpose behind a non-compete agreement like this. But there's no evidence that he actually has been involved in any competing products with DB. Well, apart from the Allograft, the MEO product, which certainly he's going to be leading the product development team on, I do want to make a comment about the nature of the proof that the court seems to have required of us. It seemed to require backward-looking evidence, what he has done in the past. And we contend, of course, that the appropriate standard is the substantial likelihood of future irreparable harm. And in a situation like this— Again, I may be way off. I thought you were saying, absolutely, there's backward evidence, because we know he had the Dropbox, and we know he had a lot of access. That's right. The difficulty for you, I thought, was did you offer any evidence suggesting that it was a possibility or likely, given their sequestration? Am I flipping it? No, no. And I want to be precise about the nature of the evidence that she seems to have required. And I think Mr. McQueen's position is that evidence is necessary of what he's actually doing at the new job. And some of the cases are built on a track record at the new employer that could provide that type of evidence. So it's not inappropriate to look backwards at what's happened at the company so far. But in order to act quickly and seek an injunction before you suffer the irreparable harm, it's necessary for a company like mine, my client's position, to move before they get to that point. And in this particular case— You don't think the district court did any of that analysis? I don't believe they did, no, Your Honor. And it's important to note that for much of the time period that we were looking at, between the time he sort of started at Vivex and the hearing on the preliminary injunction, he was enjoined anyway from doing anything. So it would have been impossible to create some kind of track record during that time in any event. What about the court's statement that it's all monetizable? The nature of the harm that we feel is at issue here. So loss of goodwill, loss of this competitive position, those are, we feel, according to the Texas cases, inherently irreparable, simply because they can't be either identified or monetized. I mean, the very definition of goodwill is an intangible asset of the company. Those are things like customer relationships and reputation, knowledge of the distribution channels. Those are things that can't be monetized and identified. And importantly, in order to get damages arising from a situation like that, we also have to isolate a causal connection between the harm caused by this employee and whatever resulting impact that has on the company. Those are things that are just, we contend, inherently difficult to quantify. Remind me, was it part of her ruling that you'd show no irreparable harm? Did she credit that McQueen had tried to disconnect his computer and undo the dropbox, but your client's IT people said you're stuck with it? No, and that's, she has, she described that piece of evidence. That's not precisely what happened. We are happy to receive that evidence and dispossess him of that information. Clearly, that was one of the objectives of our request for injunctive relief. His offer to do that, frankly, has not been satisfied at this point. There's nothing holding him back from doing that. And importantly, it's not just the dropbox evidence that's at issue as well. He also possesses these files, although they're invisible to us, on a Google Drive, on a laptop, on a phone, and on a USB drive. He had to confess that at his deposition, and those are things that are simply not visible to us right now. So what's your best evidence that McQueen is likely to divulge some of your trade secrets? The injunction provisions of the DTSA and TUTSA allow for injunctions if there is threatened misappropriation, and misappropriation, of course, can be disclosure or it can be use. Use can be established if there is possession of information while in position to use it. And so we contend, because of the nature of the position that he holds at Vivex, compared to the competitive position that he used to hold at DirectBiologics, that threat of use, the economic motivations of both parties, are squarely in favor of using whatever information is at his disposal. I hear your answer as your time runs out. He said, what's your best evidence? And your answer is his title, his position. The nature of the position, yes, Your Honor. Okay. Thank you, sir. Mr. Halfman? Thank you, Your Honor. May it please the Court, Bill Halfman for Adam McQueen. Maybe it's best to start when we finish. In response to Judge Davis' question, counsel's response was there is a hypothetical potential for damage. What he just said was, given the competitive nature that we attribute to the two companies, there's a potential for disclosure. As the trial court found, there has been no disclosure. There's been no prohibited competition. But is that your standard, that you only get a P.I. if there's proof that trade secrets are already being disclosed? That's pretty high. How would someone prove that? Is that . . . well, that was a compound question. Is that what you're saying the rule of law is in Texas, to get a P.I. in this situation? There's got to be evidence that there's already been sharing and disclosure. What's the case that says that? Well, first, I may have misspoken, Judge Higginson, because what I was saying was the trial court found no evidence of breach of the non-compete. I understood Judge Davis's question to counsel to be, what is your best evidence that he's lying that he's actually competing? There is no evidence of that, and my criticism was counsel's response was the potential for competition. But he's in breach because he started work within a year at a . . . I mean, I'm just depressed you're at a company that's very similar in its product line. I'm sorry, Judge? Well, I thought the employment agreement said he couldn't go within a year, couldn't just get employment. He can be employed without violating his non-compete agreement. At a company that develops similar product lines? Yes, provided that he's not working in that area. In fact, I think Mr. Botkin was kind enough to acknowledge that Texas law says an absolute prohibition on working for a competitor is not permissible. In fact, that's the accurate . . . But does your argument then depend on us accepting that he has no contact, he's been fully segregated? Let's say we assume that his position gives him access to these lines that are competitors. Then am I right that my first question would be relevant? What has to be shown? What has to be shown is some competition that impedes or impairs the good . . . the protected interests of the prior employer. That's why an absolute prohibition is not permitted because there has to be some evidence that the former employer's protected information is actually being used. Yes, and I'll come back to your question. Is actually being used. Yes, actually being used because Texas . . . What's the case for that? It really helps you. What's the Texas case for that? Hardoni from this court is perhaps the best case on that. I know, I know, I know. Of course, I was on the panel, but I'm not disavowing it. It may be exactly right. It's just the elements that we've got here is you've got a non-compete. You've got the guy there. There are protectable trade secrets. It's a similar product. I'm wondering how else do you show imminent injury given that constellation of where he is, product? Hardoni says you've got to show he's actually doing it. Well, the answer lies in the record, but I do want to . . . I don't want to leave this if I could, Judge. I don't want to answer your question, but in Hardoni, this court observed that Texas does not accept the concept of inevitable disclosure as grounds for a non-compete, yet that's everything Docrat Biologics is selling here today is it's going to happen. It might happen. Mr. Botkin said we had to go get an injunction before it happened, but that's not the law. Hardoni speaks the law. Right. To come back to your question, Judge, because I think it probably, if I can zoom back out for a second, it probably bears reminding that the question before this court is are any of the findings of the trial court clearly erroneous? And what Direct Biologics has done in order to dodge that question is try to wrap this up as a legal question, which the court reviews de novo. But the trial judge found no evidence of breach, and that's not me. She said what is missing from this case is any evidence that McQueen is breaching the non-compete agreement. That's her order. It's not a quibble. That does seem to be past focused. She could be on the impression that you had to have evidence of past breach disclosures, but wouldn't it suffice even under Cardoni if there were a likelihood of those given the position and the access? Yes or no? Well, part of the problem with Cardoni is it's a trade secrets case, not a Texas non-compete. No, I thought you were citing it as your strongest authority. But Texas law is very clear on this point. And again, the trial judge in her order actually digested this very issue. There is no presumption like the one that Mr. Bodkin advances to the court, and I just pulled up the accurate case because that's the case he told you is his best. So this is a Western District case. It was Judge Pittman. Excuse me. He cites the trans perfect translation case at 594 F sub 2 second 757. But this is the quote. Texas courts recognize a presumption. I'm sorry. Yes, Texas courts recognize a presumption of irreparable harm upon proof that a highly trained employee is continuing to breach a non-competition covenant. So hopefully that answers your question, Judge Higginson. That's right. I thought, what about is triggered if likely? Will? No. No, because that's the same rejection of inevitable disclosure. I think Judge Davis has a question. Isn't he continuing to breach the non-compete by staying in the employ of a new company? I mean, the plain language of the non-compete prevents him from going to work for another employer engaged in a similar business. The answer to your question, Judge, is no under Texas law. Again, the accruant case that counsel cited is directly on point because in the accruant case, the court specifically said, I'll just tell you, Judge, the accruant case as well as several other Texas cases stand for the proposition that an absolute prohibition on employment with a competitor is not enforced in a similar business. Yes, a competitor. And I should say, let's come back to, again, because the trial court found, and again, no evidence that he was—she wasn't even faced with a competing evidentiary question. There was no evidence that he is presently working in competition with his former employer. And it seems to me like there's a hole in her findings, though, in that she didn't talk about likelihood. I mean, here this guy is working in a similar business. They are one or maybe two actual competing products. He's in charge of the strategy team. You know, there's a lot of circumstantial evidence there that it would be unlikely that he's going to work for this company. He's going to use all of his knowledge. Well, she didn't talk about that for two reasons. First, Judge, as a matter of law, it would not be grounds for a preliminary injunction. There must be evidence of an actual breach. But she also didn't talk about it because she only received evidence on one side of that question. What she had, and the court will find this at 1553 at the record, is a letter between Vivex and Mr. McQueen in which Vivex prohibits Mr. McQueen from working in the one area that may be competitive with DirectBiologics. It says he may have no contact with anyone in that area. He may do no work in that area. He may not talk about any of his work at DirectBiologics. So he's been walled off from that. Now, just the fact that a competitor has a letter of agreement with the employee can't trump, right? Just because they say he's not going to do it, that doesn't determine whether he's breaching the non-competition. I agree, but with all due respect to this court, the court doesn't speculate on the potential of a difference of the finding of the trial court under the clearly erroneous standard. It's a reasonable argument, but again, it wouldn't change anything under Texas law. Texas law does not allow a non-compete to prohibit one from working for a competitor. And it certainly, in federal law, doesn't allow an injunction based upon the argument that it might happen. You were saying accountant for the competitor, correct? I beg your pardon, sir? You are the accountant for the competitor, but if you're actually in the exact competing product line and Texas law disallows that, what's your best authority for that? Well, I don't have authority for the proposition I already advanced. He cannot work in an area that was competitive. So that's what the trial judge had. She has the Vivex letter that says he cannot and will not work in the one area where the parties compete. The evidence at the trial also from the vice president of Vivex, which is at 1405 and 1406, is that they also said he cannot work in that area. He does not need to work in that area, which directly responds to Pellin's— Did she ever credit McQueen? I beg your pardon, sir? Did she ever make a fact finding, as you're suggesting, subject to clear review, that she's crediting these promises between competitor and your client? Let me find that for you in her order, Judge. Now that she says as the first-hand court of original jurisdiction, I credit that. Oh, did she go so far as to say between the two, I find one is telling me the truth? Yeah. No, and here's why. Because she didn't have controverting evidence. She says there is no evidence from the party that has the burden of proof, zero evidence. It could not be clearer at page 12 of her opinion where she says— no, I'm sorry, it's earlier in the opinion— where she says what is missing from this case is any evidence that McQueen is breaching his non-compete agreement. It's just that simple. There is zero evidence. So she doesn't need to make a determination between the two, and this court has to determine whether she is clearly erroneous in finding no evidence. Well, there is circumstantial evidence. I respectfully disagree, Judge. There is no circumstantial evidence. In fact, although Mr. McQueen had no burden to rebut the lack of evidence, as I said, he put the Vivex letter into the record, and he also had the vice president of Vivex testify. Mr. McQueen, of course, testified to the same. And the— He has the drop box that has access to all their— If I may, Judge, okay, I'll be happy to switch to that. I was talking about non— Let's talk about trade secrets if that suits the court. I do want to be clear that with all due respect to Judge Davis' assertion, there is not even circumstantial evidence that he is competing. Well, he's working for a competitor that is competing with that line, and his job is head of the strategy committee to market their products, and it seems to me that there'd be a completely permissible inference that he's going to use all of his knowledge to do that. But he's not working in that area, Judge. The undisputed evidence is he's not— Well, you know, how are they going to disprove that? See, that's the—with all due respect, that's the thing. To get an injunction, it's their burden to prove that, not to disprove that. That's the problem. And, in fact, that's exactly what Mr.— what the palace counsel said in closing. He presented a slide to the judge. This is in the record. I talk about it in the record. The slide is not in the record. His question on the slide was, how would we know? The answer is obviously discovery, but we're here about an injunction. They ran down to the courthouse, and this is in the record, too. This is all in the record. When Mr. Botkin sought the TRO, I contacted Mr. Botkin, and I said, if you have information my client is doing something, give it to me, and I'll make him stop. And he said, I'll see you at the courthouse. So we went down and had the temporary restraining order. I sat in front of the magistrate judge who presided. If there's evidence that he's doing something, give it to me, and I'll make him stop. And the magistrate judge said, we'll take that up at the temporary— at the preliminary injunction hearing. Now, as the magistrate judge has found, there was no evidence he was violating. And, judge, the only evidence is he was specifically walled off from any opportunity to violate. In fact, the vice president—and here's part of the problem. The vice president of Vivex described it this way. Vivex is the size of Walmart in what they do. Direct Biologics is like a candy store. Do they both sell candy? Yes, they do. Can Mr. McQueen work somewhere like hardware or gardening or home goods without ever going into the candy section? Absolutely. And that's what he agreed to do. And that's what the only evidence showed he was doing. Now, Judge Higginson, let me— I said, it seems to me like the opinion would have been stronger if she had covered whether or not it's likely that because of the position he's in, he would have used his knowledge that he gained with DB. I understand the court's point, but I would submit two things. One, again, in the face of no evidence, the magistrate judge could very reasonably have felt she had done what she needed to do, which was to search the record for evidence that might support the extraordinary relief in an injunction, finding none to move on. The other thing I would say is—and the court probably would know— is the hearing that, one, the federal district courts are rarely called upon, relative to the state courts, to enforce non-competes by injunction, and that the magistrate judges rarely do that. Although I have to say I think the order is actually quite thorough, both in its analysis of the— I was also a little concerned. It looked like the magistrate judge thought that the arbitrator would be the body that would decide the injunction because she dropped that footnote and said that— it looked like, from what she said, that she thought maybe it's going to be his decision anyway. To the contrary, Judge, I actually asked the court to order the case to arbitration because of the party's arbitration agreement, and the magistrate judge denied that request and took up the injunction. But you remember the footnote I'm talking about. Yes, but you'll find in the order, Judge, that the magistrate judge addressed that issue early on in the order and pointed out that I had asked the court to do just that, and the court denied that request and found that it was appropriate for the court— because direct biologics pushed for it. Now, that's the other thing. My point was the arbitrator who's going to hear this case ought to decide preliminary relief as well because— and it turns out in this case to be a she, former Judge Speedlin from the Texas Supreme Court. My point was if conditions change or evidence comes to light and there's a need to modify an injunction, it would be appropriate for an arbitrator. Direct biologics argued vociferously against that. Let me ask you one other thing. The district court concluded that even if trade secrets were divulged by McQueen and a warrant of damages to DB would be an adequate remedy, isn't that against the great weight of Texas law? I'm sorry, Judge. I didn't hear your question. Isn't the conclusion the judge reached that even if trade secrets were divulged, damages would be an adequate award? That would be an adequate remedy. I'm having trouble. Damages would be what, sir? An adequate remedy would be damages. Sure. Well, absolutely. And in fact, the Texas non-compete statute recognizes that damages are an appropriate recovery for a breach of a non-compete. In most Texas cases I see a given award and injunction if they think trade secrets are likely to be divulged. One remedy is an injunction, but one is damages. And here direct biologics is pursuing damages. That's exactly what they're doing because we are in arbitration right now, and the arbitrator is not going to enter an injunction. So that's exactly what direct biologics is pursuing. I'm sure they're doing that now, but that doesn't give them temporary relief. No, I agree, Judge. But in order to get temporary relief, one must satisfy the requirements of an injunction. And to your point, the magistrate judge also found that direct biologics proffered zero, no evidence on irreparable harm. And in response to a question from this panel just a few minutes ago, opposing counsel was asked, what is the evidence in the record? I think Your Honor asked it. What is the evidence in the record? No, it was Judge Higginson, according to my notes. But whoever it was, the question was, what is the evidence in the record of what the irreparable harm would be? And counsel gave the court a list of what constitutes irreparable harm. He said, well, it could be goodwill. Of course it could be goodwill. But in this case there has to be evidence in the record that somebody presented a risk of harm to goodwill, and the evidence refutes that. In the little time that I have left, I do want to answer your question, Judge, about trade secrets. First, let me explain the dropbox issue here. Direct biologics IT people were working with Mr. McQueen to return everything and to sever that dropbox link. The general counsel for direct biologics then sent a letter, which is in the record, telling Mr. McQueen that he could no longer communicate with direct biologics and then the IT director was told he could no longer work with Mr. McQueen to sever that link. And I've asked before the temporary restraining order hearing, at the temporary restraining order hearing, and at the preliminary injunction hearing, for Mr. Botkin to let my client terminate that link. And he, Mr. Botkin, refuses. Why? Because it's his anchor to a claim. Here's the other problem. Nobody at the preliminary injunction hearing testified. I guess I'm not an IT guy in your time, sure, but I thought, well, a severance alone doesn't do anything for the metadata to see if he moved it elsewhere. Wasn't that their answer? That can be done after the link is severed. Moving it, his computers can be analyzed later to see whether he moved it elsewhere. But here's the last problem in the few seconds I have left. This court has previously acknowledged that there has to be real evidence that something is a trade secret. And there was no evidence. In fact, at the temporary restraining order hearing, a paralegal testified. She testified that she found these folders. The question was, did you look at any of those folders to see whether there's actually trade secret information? She said, no, I did not. Then at the preliminary injunction hearing, the CEO testified, and he testified, I'm not aware of whether any of those things are really our trade secrets. Mr. McQueen testified that they were about a year old and that he hadn't accessed them because they had no value to direct biologic business. So there's also no evidence that they're actually trade secrets. And I would respectfully submit that just like the refusal to break the link, direct biologics knows they're not trade secrets. They won't let us... Last court magistrate, Judge, did she make a finding as to no value? She made a finding that there's been no evidence of use of the trade secrets. And as this court has embraced, and Judge Lake wrote in the Weatherford International case, which is cited at page 29 of the brief, the injunction that's appropriate for the possession of trade secrets is the return of the secrets, not the preclusion of the individual to work. There's no case that says a non-compete could be founded upon a trade secret violation because the remedy is simply to return the trade secrets, which, by the way, I don't really understand the Helen citation. You've exceeded your time, sir. I have, Judge, I apologize. I'm very passionate about it, but I appreciate the court's additional time. Thank you. Thank you, Your Honor. I'd like to address the return of the information point first. In our motion to expedite this appeal, there's an exchange of emails. We have proposed a forensic examination and severing of the link in a manner that preserves the metadata and ensures that we have some kind of verifiable way to ensure that that information is returned. Mr. McQueen's counsel has not agreed to that procedure. That's before the court in the motion for expedited relief. The evidence of irreparable harm we've laid out at pages 15 and 16 of our reply brief, two full bullet point pages' worth of evidence. In general, they establish the competitive position of the two companies and the similarity of the position of Mr. McQueen. Certainly, we contend that just the juxtaposition of those facts, as found by the district court, is sufficient to trigger the likelihood of irreparable harm in this case. Now, it seems that counsel has relied heavily on this, I'm going to call it a winking pinky promise, between the new employer and the employee that we promise not to compete in violation of your old non-compete. I also want to point out that these parties knew there was litigation coming ahead of time, and you can see just from the fact that agreement exists that they expected there to be a challenge from direct biologics to enforce their non-competes. I would submit to the court that if a bare promise, unverified promise, were sufficient to defeat a non-compete agreement under those circumstances, then very few of these things would ever get enforced. I thought he was suggesting that with the Walmart image that the district court made a finding that he's in the toy section, has nothing to do with the candy section. Your Honor, she found that they compete in the very product that he's handling at Vivex. Well, they may, but I thought he's been segregated and she made a finding that he has, no? It is impossible to conclude that, Your Honor. The job description and his testimony, and the testimony of the Vivex employee, by the way, at the hearing confirms that there is a direct link. His job responsibilities at direct biologics and his job responsibilities at Vivex are concerning the same competitive type of product. That's uncontested. There is a bare promise that we won't compete, but it's simply not justified on the factual record here. Is your argument one of clear error, or did she not make the finding that he suggests she made? Our argument is that these are legal errors. So the contractual error and the errors with respect to the backward-looking evidence and then the disclosure issue on the trade secrets, those are to be reviewed de novo. To the extent that she made any factual findings, which she did not on that particular point, I suppose we would have to say that they are clearly erroneous, but she did not make that particular factual finding in this case. The reason I like... One of the things that's... Just to follow up on that point, one of the things that's not in the record is any sort of confirmation or verifiable evidence that they have in fact segregated those responsibilities within Vivex. There's the bare promise. We promise not to do it, but there's no surrounding evidence that at least would be visible to us that that is in fact is the case. We have the promise, but nothing more. The reason I like the Accruant case is because a party tried to make that argument that we promised not to place this new employee in a competitive position, and the court did not credit that argument. It was in the discussion of the breach component, not irreparable harm, but we think the principle still applies in this case. Quickly on arbitration, and I'm sure the court has noticed this, the employment agreement commits injunctive relief to the state and federal courts, and so there is no question that we are properly before the federal courts in this case. The remainder of the case is now properly in the hands of Justice Feedland. I'm sure she would like the promotion to Texas Supreme Court if she was a court of appeals justice, but that's where this stands, and procedurally we're in the right place. And then finally on the damages question, I'd like to distinguish the types of cases that you see with irreparable harm because I think it's important to note that some of these cases, the sales guy with the customer list, those are the types of cases where evidence can be developed quickly because there tends to be a track record of somebody going out on the marketplace and selling, but in these competitive position cases that involve strategy, the harms arising out of that particular circumstance is further away. Thank you, Your Honor. Thank you.